# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CRIMINAL ACTION** |
| | ) | **NO. 11-MJ-6060-LTS** |
| RONALD VIGEANT, | ) | |
| Defendant, | ) | |
| | ) | |

## REPORT AND RECOMMENDATION
### ON BOP'S REQUEST FOR ORDER AUTHORIZING
### <u>FORCIBLE MEDICATION OF DEFENDANT TO RESTORE COMPETENCY</u>

### March 29, 2012

**SOROKIN, C.M.J.**

For the reasons set forth below, the undersigned RECOMMENDS that the Court authorize the Bureau of Prisons ("BOP") to medicate forcibly the Defendant, in order to restore his competency.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

On May 9, 2011, a criminal complaint was filed against Defendant charging that on May 6, 2011, Defendant assaulted a federal employee in violation of 18 U.S.C. § 111(a)(1) and (b). Docket #2. The affidavit attached to the complaint alleges that, on May 6, 2011, Defendant struck a supervisor with the United States Postal Service while on duty, hitting the Postal Service employee several times in the head and body. Docket #2-1 at ¶ 3. The Postal Service employee was diagnosed

1

with multiple bodily injuries, including a broken pelvis, two cracked ribs and cuts and bruises to his face, including cuts to his lip requiring stitches. Id.

At the initial appearance, on May 10, 2011, the Court allowed court-appointed counsel's motion for funds to have Defendant evaluated as counsel was concerned that Defendant was not competent. On May 17, 2011, the Court allowed Defendant's Motion to Determine Competency and also ordered Defendant's detention. The Court held a competency hearing on October 14, 2011, after which, the Court found, by a preponderance of the evidence, that Defendant was presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Docket #13. On November 16, 2011, Defendant was admitted to FMC Butner to undergo a medical evaluation pursuant to 18 U.S.C. § 4241(d). The Court held a competency hearing on March 2, 2012.

During Defendant's evaluation from November 16, 2011, until the Forensic Evaluation issued on January 12, 2012, Defendant was interviewed individually by Drs. Ralston (Staff Psychiatrist) and Reardon (Staff Psychologist).[1] Gov't Ex. 2 at 1. Other members of the Forensics Team, Correctional and Mental Health staff observed Defendant's behavior throughout the course of the evaluation. Id. Their comments were considered by these two doctors in making the evaluation. Id.

Defendant refused to speak to the evaluators though he did, to some extent, communicate

---

[1] This was Defendant's second BOP evaluation. He was evaluated at FMC Devens for competency during the period June 30, 2011, to September 12, 2011. Gov't Ex. 2 at 3. The Devens evaluator diagnosed Defendant with Schizoaffective Disorder, Bipolar Type and noted a component of mania in Defendant's presentation. Id.

in writing.  <u>Id.</u>  Although various documents were reviewed, no records predating the date of Defendant's arrest were obtained or reviewed by the evaluators.  <u>Id.</u> at 1-2.

In pertinent part, Defendant has a history of use of PCP and methamphetamines.  <u>Id.</u> at 2. He is an honorably discharged veteran having served in the United States Army.  <u>Id.</u>  His son reported that he first showed signs of mental illness three to four years ago when he began "talking to himself."  <u>Id.</u>  On multiple occasions he was hospitalized at Tripler Army Medical Center, "but treatment records were not available at the time of [the evaluator's] report."  <u>Id.</u>  In 2010, he was involuntarily hospitalized by a court in Hawaii due to a diagnosis of Schizophrenia and "exposing self to danger."  <u>Id.</u>  He starved himself during the hospitalization thereby causing his release.  <u>Id.</u> According to his son, Defendant received psychotropic medications while in Hawaii of unknown names and the medication was effective in treating the psychotic symptoms.  <u>Id.</u> at 2-3.

Since arriving in Massachusetts in 2010, Defendant's sister reports that he has displayed bizarre behaviors, spoke in new languages and expressed delusional thoughts.  <u>Id.</u> at 3.

While at Butner, the evaluators found Defendant suffers from Hepatitis C, herpes simplex virus and that he was diagnosed with HIV in 2004.  <u>Id.</u>  Defendant also reported a prior myocardial infraction in 2003.  <u>Id.</u>  No other medical concerns were noted.  <u>Id.</u>  Defendant was not taking medications upon his arrival at Butner and he refused them while there.  <u>Id.</u> at 4.

During the initial interview, Defendant wrote answers to questions though he declined to speak because "I don't want any problem with disometers with my speech."  <u>Id.</u> at 4.  Regarding his problem he wrote "100% Depressive Disorder-VA-The part of central nervous system and brain missing (while in Army)."  <u>Id.</u>  The next day, when asked if he would speak since writing in handcuffs was difficult, Defendant wrote, "You asked, I answered.  I know what you're all about,

now that's all I have to know." Id. at 5.  Thereafter he terminated the interview and for the next week remained uncommunicative.  Id.

About two weeks later, Defendant began speaking with the evaluators.  Id.  His speech was filled with delusions, e.g. he spoke of a nerve in his back called "Yehaw" which was removed along with all his serotonin.  Id.  After one lengthy conversation, he again become non-communicative though he appeared to respond to internal stimuli as he spoke loudly and gestured as though addressing a group of people.  Id.  Sometimes he shouted profanities at his psychiatrist and continued to do so in his empty cell after the termination of the interview.  Id. at 6.

The evaluators conducted no psychological testing because of Defendant's inability or unwillingness to communicate effectively or consistently due to his psychosis.  Id.  Ultimately he was diagnosed with a Psychotic Disorder, Not Otherwise Specified (NOS).  Id.  The evaluators applied the NOS designation due to insufficient historical data to further clarify the diagnosis.  Id.  They did note that the presence of either manic episodes or depressive episodes would support a diagnosis of schizoaffective disorder.  Id.  The evaluators found Defendant "grossly psychotic and unable to communicate consistently or in a reality-based manner," thus they opined he is not competent.  Id. at 7.

However, the evaluators are of the opinion that "there is a substantial likelihood that with appropriate treatment, he may improve to such an extent [that] his competency to proceed may be restored."  Id.  Thus, they are requesting judicial oversight and permission to treat Defendant with psychotropic medications for the purpose of rendering him competent to stand trial.  Id.

DISCUSSION

The Court accepts Defendant's argument that the Government bears the burden of proof by clear and convincing evidence. United States v. Fazio, 599 F.3d 835, 840 n.2 (8th Cir. 2010); United States v. Bush, 585 F.3d 806, 814 (4th Cir. 2009); United States v. Grape, 549 F.3d 591, 604 (3d Cir. 2008); United States v. Green, 532 F.3d 538, 545 (6th Cir. 2008); United States v. Bradley, 417 F.3d 1107, 1114 (10th Cir. 2005); United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004); United States v. Burhoe, 692 F. Supp. 2d 137, 142 (D. Me. 2010). The Government has not suggested otherwise.

In Sell v. United States, 539 U.S. 166, 180-81 (2003), the Supreme Court authorized forcible medication of a defendant to restore him to competency for trial in the "rare" case in which the Government satisfies each of the following four conditions: (1) "important" governmental interests are at stake; (2) involuntary medication will "significantly further" the governmental interests; (3) involuntary medication is "necessary" to further those interests; and (4) the administration of drugs is "medically appropriate."

However, the Supreme Court "emphasized" that before conducting the Sell analysis, courts should consider "whether forced medication is warranted 'for a different purpose, such as the purposes set out in Harper related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk.'" Burhoe, 692 F. Supp. 2d at 142 (quoting Sell, 539 U.S. at 181-82 (referring to Washington v. Harper, 494 U.S. 210 (1990))). Based on the BOP report that Defendant is not now a danger to himself or others (a point undisputed by Defendant), the Court finds that Defendant does not meet the criteria for involuntary treatment pursuant to the Harper standard. Therefore, the Court now proceeds to the

<u>Sell</u> analysis.[2]

1. Important Governmental Interests Are at Stake.

The criminal complaint charges Defendant with assault on a federal employee in violation of 18. U.S.C. § 111(a)(1) and (b). The offense carries a statutory maximum punishment of twenty years in prison. Not only is the offense categorically one of violence, <u>see</u> 18 U.S.C. § 16 (defining a crime of violence, inter alia, as one having as an element the use of force), the circumstances of this offense, as set forth in the affidavit in support of the criminal complaint involve an unprovoked violent act on a federal officer, an employee of the United States Postal Service, resulting in a broken pelvis as well as other injuries. Docket #2-1 at 1-2. By any measure, this offense is a serious one within the meaning of <u>Sell</u>, thus it supports a finding that important governmental interests are at stake. <u>See</u> <u>United States v. White</u>, 620 F.3d 401, 410-11 (4th Cir. 2010) (noting that the Fourth Circuit applies an informal rule that offenses carrying ten-year maximum punishments are serious); <u>United States v. Brauner</u>, No. 08-20059-CR-GOLD, 2008 WL 2635527, at *1 (S.D. Fla. June 30, 2008) (physical assault of a federal officer which resulted in substantial bodily damage and carried statutory maximum term of imprisonment of twenty years is a serious crime).

While a number of special circumstances require consideration, none are sufficient to undermine the important governmental interests at stake in Defendant's prosecution. Defendant has been detained since May 10, 2011, and, if the Court allows the forcible medication request, he faces a further substantial period of time, reasonably anticipated to be four months, enduring that process. Nonetheless, this period of time (even combined with the time already spent in pretrial detention and

---

[2] While the Defendant's HIV diagnosis gives the Court some pause, the Court cannot say his refusal to medicate for this illness puts his health "gravely" at risk in the absence of a medical opinion so stating.

the further post-competency period of time required to prepare the case for trial, if restoration is successful) is far less than the statutory maximum or even the anticipated guideline range after trial of 70-87 months and a range on a guilty plea of 51-63 months. While a civil commitment proceeding is theoretically possible, the present record does not support the conclusion that such a commitment is likely. He has not behaved in a violent or dangerous way in prison. He has no documented history of violent activity. Thus, the Government has established that Defendant does not now face a likely civil commitment that undermines the Government's interests here. Finally, Defendant raises the possibility that even if rendered competent the jury will find that he was legally insane at the time of the offense. That is an affirmative defense for which Defendant will bear the burden of proof. The record contains no expert opinions on this issue and I find it is not sufficient to undermine the Government's showing.[3]

Accordingly, I find that important governmental interests are at stake.

2.      The Proposed Course of Medication is Substantially Likely to Render Defendant Competent and Substantially Unlikely to Cause Side Effects That Would Interfere with Defendant's Ability to Assist his Defense.

The Court heard the live testimony (via video conference) of Dr. Ralston, a staff psychiatrist at the BOP's Butner facility. Dr. Ralston was a well-educated compassionate physician whose testimony was forthright and candid. She evidenced appropriate concern for her patient's, the Defendant's, medical and psychiatric well-being. She also had a substantial basis for her testimony.

---

[3] The Government indicates that the only reason for its failure to seek an Indictment to date is its desire to see resolution of the questions regarding Defendant's competency. It does represent that it intends and will seek Indictment. I do not find this rises to the level of a special circumstance sufficient to otherwise defeat the Government's successful effort to meet its burden of proof.

She benefitted from several weeks of her own personal observation of the Defendant while he was at the Butner facility as well as the observations and insights of other staff and clinicians at the facility. I credit her testimony even though, as pointed out by the defense, she does not hold a Board certification in forensic psychiatry.

There is no doubt nor dispute that the Defendant suffers from significant psychosis manifesting itself in numerous delusions such as (1) Defendant's belief that a nerve in his body and all of his serotonin were removed; (2) Defendant's belief that his family was killed in a car accident; (3) Defendant's belief that his genitals have been mutilated; and (4) Defendant's conversations with non-existent people in his cell. Gov't Ex. 2 at 4-5. Dr. Ralston diagnosed Defendant with a psychotic disorder, not otherwise specified. Id. at 6.

Dr. Ralston, in consultation with other more senior colleagues at BOP, recommends a course of forcible antipsychotic medication beginning with Haldol. In her testimony and report, she attests that:

> -"[A] large percentage of incompetent defendants suffering from Schizophrenia and related psychotic disorders who refuse the recommended treatment with antipsychotic medication can be restored to competency to stand trial following a period of involuntary treatment."
>
> -Data regarding schizophrenia indicates that only ten to thirty percent have little or no response to such medication with the remaining patients having a sufficient response to restore the patients to competency.
>
> -That physicians at Butner have had successful results treating patients with psychotic disorders with antipsychotic medication as it is often these psychotic symptoms that interfere with competency including a high correlation between treatment with antipsychotic medication and restoration of competency.

Id. at 8-9.

The defense expert, Dr. Schouten, an accomplished and experienced forensic psychiatrist also testified. He, too, was credible and forthright. He raised several points of concern. Most of

the data cited by Dr. Ralston concerns schizophrenia, however, Defendant does not have that diagnosis (though he apparently did receive that diagnosis in Hawaii). Moreover, a first diagnosis of schizophrenia in persons over forty-five, such as Defendant would be unusual. Nonetheless, the DSM-IV admits of that possibility. Of more significance to the Court is the general success of antipsychotic medications as a standard successful course of treatment for psychosis even though most of the research concerns schizophrenia.

Dr. Schouten also raised the prospect that Defendant may exhibit psychosis as a byproduct of an AIDS dementia complex or encephalopathy. While the BOP could have, but did not, perform a relatively simple, according to Dr. Schouten, T-CD4+ T-cell test to determine whether Defendant suffers from this complex,[4] Dr. Schouten conceded that some of the medical literature suggests that antipsychotic medication should be used to treat AIDS patients exhibiting psychotic symptoms. For example, Dr. Daniel Sewell wrote "Regardless of the etiology of the psychotic symptoms, symptomatic treatment with neuroleptic medication [i.e. antipsychotic medication] is usually necessary, at least initially." D. Sewell, Schizophrenia and HIV, Schizophrenia Bulletin Vol. 22, No. 3 at 470 (1996). Dr. Ralston testified that antipsychotic medication is substantially likely to restore Defendant to competency regardless of the source of his symptoms.

In addition, Dr. Ralston buttressed her conclusion with information received from Defendant's son. The latter reported that his father received medication for psychotic symptoms in Hawaii and responded favorably to the medication. While Dr. Ralston never reviewed or received the records of this hospital stay from Hawaii, in the context of all of the evidence, it is a reasonable

---

[4] I note that Dr.Schouten conceded that the test would not establish conclusively that Defendant's psychotic symptoms arise from an AIDS complex, but only whether he suffers from the complex.

consideration further supporting the Government's position. This is not the case, as occurred in United States v. Austin, 606 F.Supp.2d 149, 152-53 (D.D.C. 2009), in which the primary conclusions rested upon a cursory review of the defendant's medical records.

After due consideration of the foregoing, I find that the Government has met its burden of proof to establish that forcible medication with a regime of antipsychotic medication is substantially likely to restore Defendant to competency. See Gomes, 387 F.3d at 161-62 (seventy percent success rate in restoring defendants to competence through treatment through anti-psychotic medication is significant).

The administration of the antipsychotic medication may result in side effects, however, these side-effects would be monitored and minimized by dosage reductions and adjunctive medication as needed. Gov't Ex. 2 at 9. Thus, the Government has met its burden of proof on this prong as well. I do not mean to discount the significance of these concerns, however, I believe they are more properly addressed in other sections of the analysis.

3.  Involuntary Medication is Necessary to Further the Government's Interests

The Government has established that Defendant's psychosis is fixed and not amenable to other less intrusive forms of treatment. He refuses oral medication. He declines to participate in interviews or therapy and his lack of insight and delusions render him, at this time, a poor candidate for talk therapy. These conditions have persisted for a substantial period of time. Accordingly, I find that treatment with antipsychotic medication is the only viable means available of restoring Defendant's competency. Notably, the Defendant concedes this point.

4. The Treatment is Medically Appropriate

The proposed treatment is a standard medication plan for anyone suffering from psychosis. As noted above, the medication can ameliorate these symptoms. It further offers the possibility of enabling, upon a restoration of competency, the administration of HIV treatment to Defendant, something all agree is medically appropriate, but which, to date, Defendant has declined. (This treatment is not available on an involuntary basis as it is oral medication). The antipsychotic medication does not interfere with the HIV medication even when taken together. While Defendant expressed to Dr.Schouten a willingness to accept such treatment in the course of a Courthouse interview shortly before the hearing, he has not done so to date as far as the Court is aware.

The involuntary nature of the treatment plan calls for the use of long-acting injectable medications, initially tested in small doses to insure Defendant does not experience an allergic reaction. The plan is sensitive to this risk and the possibilities of various side effects including tardive dyskinesia ("TD"). Specifically, BOP requests permission to administer Haldol Decanoate with a an initial test dose of short-acting Haldol Lactate. Assuming no adverse result, BOP would administer the Haldol Decanoate with intramuscular injections of 100-150 mg every two weeks for the first two months of treatment thereafter reducing the injections to once every four weeks. The medication can cause numerous side effects – Parkinsonia effects, dystonic reactions, akathisia and TD - notably all the side effects other than TD are reversible with discontinuation of the medication. Short of discontinuing the medication, BOP can administer Cogentin to remediate some of the symptoms such as rigidity, shuffling gait, etc., though this medication has its own side effects (such as dry mouth, blurred vision, dizziness and constipation). As a prophylactic measure, BOP would administer 2 mg of Cogentin with intramuscular injections during the first two weeks of the long

acting Haldol administration as this would also address dystonic reactions which occur in about ten

percent of patients.  Gov't Ex. 2  at 11.  In response to some side effects, BOP would consider a

lower dose of Haldol in conjunction with the use of Inderal or Ativan.

TD poses the greatest risk due to the possibility that it is not reversible and it may result in

incapacitation.  Id. at 11.[5]  It is a delayed effect of "typical antipsychotics" such as Haldol rarely

occurring until after six months of treatment, but then occurring at an incidence of four percent per

year with a lifetime prevalence of approximately thirty percent.  The longer the patient receives a

typical antipsychotic the more likely he or she will develop TD.  TD consists of involuntary,

irregular combinations of writhing and jerking movements of the voluntary muscles of the head,

limbs and/or trunk.  Because there is no effective treatment for TD, early intervention is imperative.

Id.  Reversal occurs in fifty percent of the cases upon discontinuation at the first signs of TD.  Id.

at 12.

The evaluators suggest that, in the event Defendant fails to respond to the Haldol Decanote

after a therapeutic trial of approximately six months, they would consider a trial of Ripserdal Consta.

That medication, however, is oral only according to BOP (though Dr. Schouten testified it was

available for intramuscular injection), thus it would require Defendant's willingness to accept the

medication and therefore would raise no Sell issues of forcible medication.  The evaluators opine

that they would expect an efficacious treatment result with a predicated success rate approaching

---

[5]  The Butner medical records contain a note that Defendant showed signs of TD. This
note was made at the very beginning of the evaluation. No other documents in the record reveal
similar observations.  The detailed and comprehensive evaluation makes no mention of such
symptoms.  The defense expert observed Defendant, albeit briefly, in the lockup before the
hearing.  He made no mention of observing signs of TD.  Finally, nothing in the record suggests
any significant treatment with typical antipsychotic medication for a meaningful period of time.
Accordingly, I decline to find that Defendant now suffers from or exhibits symptoms of TD.

seventy percent.  Id. at 13.  They do not believe Defendant is a danger to himself or others while in custody.

I find that the Government has established that the treatment plan is medically appropriate and that it has described the proposed treatment plan with specificity as required.  See United States v. Hernandez-Vasquez, 513 F.3d 908, 911 (9th Cir. 2008).

CONCLUSION

The limited available precedent indicates that the question before the Court is one requiring resolution by a United States District Judge, United States v. Rivera-Guerrero, 377 F.3d 1064, 1069 (9th Cir. 2004), accordingly, I follow that course.

For the foregoing reasons, I RECOMMEND that the Court ALLOW the Bureau of Prison's request to forcibly medicate Defendant as described in the January 12, 2012, evaluation and proposal which I recommend the Court approve. Specifically, I RECOMMEND that the Court order a four month commitment pursuant to 18 U.S.C. § 4241(d) for the purposes of attempting to restore Defendant to competency with a further report to the Court no later than at the end of the four month period.[6] Given the interests at stake, the parties are urged to file their responses, if any, to this Report as soon as reasonable possible within the fourteen day objection period.


/S/ Leo T. Sorokin
LEO T. SOROKIN
MAGISTRATE JUDGE

---

[6] The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).